5-1299, Sports Enterprises versus Marvin GoldKlang, is that correct? GoldKlang? Whenever you're ready, counsel. Thank you and good afternoon, your honor. May it please the court, Alex Nadeau of Tarlow, Nadeau & Summers on behalf of Appellant Sports Enterprises Inc. With the court's permission, I'd like to request three minutes of rebuttal time. Sure. This appellant appeals the district's grant of defendant's motion to dismiss with prejudice. The underlying action involved a single cause of action breach of fiduciary duty. So the question before the court is a narrow one. It is whether appellant alleged sufficient facts given all reasonable inferences to those facts to establish a fiduciary duty. To whom? To Sports Enterprises Inc. as a member of the Florida's non-profit statute extends the fiduciary duties of a director in a non-profit to the corporation and its members. Even if that's true, is Sports Enterprise a member of the National Association? That is certainly an issue that's been raised by the defendant and we believe yes and I would cite the court to a number of provisions throughout the National Association Agreement, the NAA. That extends to leagues only, not clubs, right? Well, in the agreement itself, there are numerous provisions that identify clubs as members. It refers to paying for, as an example, member dues paid by the clubs. There is at the very end of the agreement, and this would be Appendix 344, it says, this agreement shall be binding upon our successors and successors and upon any and all association leagues and clubs now members of this association or hereafter becoming parties to this agreement. It goes on in the appendix to specifically call out Sports Enterprise, well, Salem-Kaiser Volcanoes, which is the minor league baseball team owned by Sports Enterprise. In the agreement, they are identified by name and there are again multiple provisions throughout this agreement where the clubs are referenced as members. And in addition, so if you're a member, you could bring derivative claims under your non-profit statute, right? We could, yes, your honor. Then why didn't you bring one here? So some of the case law identifies the, well, we talk about individual harm and I think the case law is in our favor in the sense that in here, when there's harm to only some but not all of the members that a direct cause of action is available, and that is what was brought here. And so when you have harm only to some out of the 160 members, there was only harm to some of those members by being excluded from the future league or the new version of minor league baseball, if you have it. That was the basis for bringing a direct cause of action, which I believe is available under Florida law. It seems like, and believe me, I don't know much about major league baseball, much less about minor league baseball, but it seems to me that when you have a situation like this, there were 190 clubs at one time. 160, your honor. When the association is negotiating with major league baseball on behalf of those 160 clubs, if the 160 number were to be reduced down by a number 130, doesn't that work to the benefit of the 130 clubs that remain after that abuse is consummated? Absolutely, your honor. Automatically, just by the sheer exclusivity of the nature of the business, that value is going to increase, which is in fact what happened with Mr. Goldkling's other clubs. So why, what sense does it make to find a fiduciary duty to the ones that are excluded if you advance the interests of the ones that remain by reducing the number of people in the association? Because the individuals who took on the role for the National Association to oversee and govern that took on an obligation to advocate for the economic interests of the whole, not just the individual or certain portion of the individual. The whole being the corporation? The corporation and the members, because again... Well, no, when you say that, that's putting the rabbit in the hat when you say the corporation and the members. I'm looking at sections, chapter 617 of Florida Statutes. It's section 617-0830. Sub 1 talks about a director shall discharge his or her duties as a director and then through in good faith, A, B, with the care of an ordinary prudent person, but then C, in a manner he or she reasonably believes to be in the best interest of the corporation. It seems pretty clear that any duty is owed to the corporation. And your honor, that exact same language is in the for-profit corporation statute and it's undisputed that under Florida law, for-profit corporate directors owe fiduciary duties. So that language is not what I guess the point is. It doesn't exclude the possibility of a fiduciary relationship arising in the non-profit context by a director or officer. It sets forth a standard of that duty, but it doesn't preclude one because the same language is used in the for-profit statute. And again, it's unequivocally unequivocal there that those directors do owe fiduciary duties. What about the language in 617.1908? The Florida Business Corporation Act does not apply to any corporations not for profit. And again, it's not that it applies, it's that it's to show the statutes are the same in the it's not applying the for-profit statute to the non-profit entity. That is not what we are doing. We're merely highlighting that, again, the non-for-profit statute does not foreclose a potential fiduciary relationship arising. And that is where we... So who did the defendant violate here, so to speak? His duty is to the league, right? Not to the individual clubs. I disagree. I'd say as members of the National Association Agreement that they, or at a minimum, the beneficiaries of that agreement, by running the league, they owe duties to those member clubs. But how can you impose that sort of fiduciary duty when a lot of the interests of the clubs may not be consistent with one another? Again, part of it is this unique nature of this relationship of minor league baseball that has arisen for so long and evolved over the course of this period. And in particular, I would highlight control. The National Association had so much control over what the minor league clubs could do. You have to go one more step. You have to show some type of affirmative act or acts of gold-plying. Correct. There was this breach of a duty, if there is a duty. What were those affirmative acts? So beginning as a board of trustee member, he then voluntarily imposed himself into the negotiations, negotiating privately on his own, not as part of the club, directly with members of MLB. We allege he had meetings during the negotiations with MLB folks that were not disclosed to the negotiating committee or the rest of the league. He was working behind the scenes. He had a conflict of interest, which immediately creates a shifting of the burden when you have that kind of conflict of interest in a fiduciary duty situation. Does every minor league club involved in this whole matter have certain conflicts of interest? Not to the extent. We had a direct conflict of interest with between the two parties negotiating, MLB and MILB, because of Mr. Goldklang's ownership interest in the Yankees. We had an even bigger conflict of interest with his ownership of an independent club. So to answer your question, there's some amount of conflict within the organizations, but his conflict was far greater in the sense that he had an independent club that he was getting into the minor league baseball through his negotiations with MLB to the detriment of clubs that were already members of the National Association. Goldklang points out that there are not one, not two, not three, not four, but five degrees of separation between him and Sports Enterprises. There's the negotiating committee, the National Association president, the National Association itself, the member leagues, and then finally the clubs like the Volcanoes. So how do you- I would analogize it to any other for-profit corporation. You have a board of directors, there is an officer, and there are committees that are organized. It's the shareholders, it's the member clubs who the duty is owed to. The same number of levels apply in that context as apply here. There's not any additional levels other than this argument over leagues versus clubs, which again, if the language in the NAA is at a minimum ambiguous about whether or not clubs are members of the NAA. Isn't your real argument that you've got a person here who's involved on the negotiating committee who owns three minor league clubs and has a and it sounds like what you're saying is ipso facto, he should have recused himself. He didn't do that. Therefore, somehow he's liable for something, but I'm not sure what he's liable for. Well, that would be one of a number of allegations in our complaint about conduct, affirmative conduct that he took and did to undermine the ability of the National Association to protect its member clubs. And those allegations I just mentioned- If Goldklang wasn't there, I mean, remember the agreement expired in 2020, right?  So at that point, you had 160 clubs. Later on, it went down to 120. Goldklang, was he a sponsor of that? Again, what did he do that somehow hurt the 40 that weren't involved in the end? So part of the argument is this kind of fait accompli argument that this was going to And so what the allegations though show and what the evidence was showing is that at the beginning, MLB had at a minimum financial commitments that they were willing to make to the potential clubs that were not going to remain. Through those negotiations and through internal negotiating committee discussions, they advocated for better terms for the remaining to the exclusion- Who's the they? They being the members of the negotiating committee, including Mr. Goldklang and his conduct on that committee. And he negotiated the greater benefits for his remaining clubs, protection, 10 years versus five years protection, an evergreen clause, meaning that his teams would get, if he did not receive affiliation after the 10 years, would get a payout. Certain things that they benefited that MLB did not offer originally. They got to the detriment of then MLB not giving any additional compensation to the clubs that didn't. See, isn't that some of the tension we have here in that the interest of the clubs are not always consistent. Many times they're inconsistent. That's why the fiduciary duty is to the league, not to the clubs. Right. And that is why the league has the authority vested with the president to do the negotiations with MLB. Mr. Goldklang inserted himself into that role to take that on himself when he should never have done that because of the conflicts that he has. And so because the president doesn't have ownership in the clubs, they are officers that work for the benefit of all the members. He took a role on and then went beyond just being a committee member, took a role on to actively undermine, according to our allegations, taking direct steps to undermine the negotiations to the detriment of the league and the clubs. I see my time is out. We'll see you on rebuttal. Thank you. Good afternoon, Mr. Is it Kofensky? Konesky. Konesky. Good afternoon, Your Honor. Good afternoon. May it please the court. SEI's contention is that Mr. Goldklang owed a fiduciary duty to serve and protect its for-profit economic interests, as well as those of each and every one of the 159 uniquely situated clubs throughout the United States of America that comprised, or I should say were part of, leagues that comprised, more specifically, the National Association of Baseball Leagues. And just because there was a question, I just want to be direct. The National Association Agreement, which is essentially the governing document for minor league baseball, makes crystal clear who the parties to that agreement were. Specifically, in Section 21.01, it identifies the parties as the members of that not-for-profit organization and the clubs as constituents of the league. There are obviously references to the clubs throughout the document because, as the document states for itself, the purpose of the National Association of Baseball Leagues was to govern, to run minor league baseball. It wasn't because it was a not-for-profit to generate profitability or to distribute profits akin to what a for-profit entity would and, frankly, is what creates the fiduciary duty for a for-profit corporation. But to whom does your client owe a fiduciary duty? To the league? Absolutely. To nobody? To the league? Oh no, for sure. There was a, I mean, Florida law, and your honors referenced it, Florida law is very clear that that duty, specifically, according to Florida Statute 617.0830, is to serve the best interests of the corporation, in this case, the N.A. This is not the first time this issue has been raised. It's obviously the first time it's been raised with respect to the National Association, but in the First Circuit case of Mount Ida College, it was, frankly, an analogous case, although I would say we have even a better example of why the duty has to be to the league and can't be to the actual members. In the Mount Ida case, again, Mount Ida was a private college. The college determined on very short notice that it was in a financial crisis. They had to close the college. They notified students that the college was going to be closed in six weeks. Both prospective and current students sued and said, well, no, you have to, that's not in our best interest. You have to keep the college open. The court, citing a virtually identical statute under Massachusetts law, under their not-for-profit statute, which included the same language of, you have to act in the best interest of the corporation, found precisely what the Stewart case found in the Northern District of California, which is... But when Goldklang, he accepted a position on the negotiating committee, didn't he communicate to every club that he would be acting for the benefit of them? Well, for purposes of the motion to dismiss, which is the stage we're at, even accepting that is true, that he's acting on behalf, he's not acting on behalf of them individually. He's acting on behalf of them collectively. And the tension is what Judge McKee identified. And this is why I would submit a stronger case than was even before the First Circuit in the Mount Ida College case. In that case, arguably, all the students, conceivably, had a uniform interest in the school staying open, so they could maintain academic semester and continue. Here, there is no way that Mr. Goldklang could have possibly served the interest of the 120 teams that Major League Baseball had already identified for future affiliation with... So why did he make that communication? If I'm one of the clubs that's been excised later after the prior agreement expired, I'd be saying, well, geez, did this person really mean what he said to us, that he's going to be acting for the benefit of every club? Well, I don't... Again, I think what he was conveying is what exactly happened and what his obligation is under the law. It's to act in the best interest of the organization as a whole, right? Frankly, was that an impossible feat, ultimately, after Major League Baseball made the decision that 40 teams were going to be contracted? Perhaps. That certainly is the appellant's contention here. But that statement does not expand his fiduciary duty beyond what law provides. Now, the argument that flows in face of a statutory prohibition, both the fact that the not-for-profit statute itself limits the fiduciary duty to the corporation, and frankly, I believe Judge Restrepo mentioned that the law also specifies that you can't extend the for-profit law to a not-for-profit. It specifically excludes that. What appellants have tried to do here is analogize a not-for-profit corporation to a for-profit corporation. Again, I direct the court back to the National Association's agreement, because the agreement is crystal clear in Article 2, which is included at Appendix 154, what the purpose of the organization was, and frankly, by exclusion, what it wasn't. There is no reference in the National Association agreement whatsoever about promoting, let alone saying that the primary objective was to look out for the best economic interest. Now, to the extent that's the allegation we're facing here on the complaint, I would tell you it doesn't make a difference beyond even just the preclusion under the law, because promoting a general, even if it's a trade organization, as they analogize, promoting a trade organization's general economic interest is something, frankly, that happens all the time for not-for-profit organizations. In fact, the Stewart case decided out of the Northern District of California with respect to this specific Florida statute was a trade organization. It was an organization of physicians, of course trade organizations, and of course 501c6s, and frankly, probably 501c3 organizations generally promote the economic interest of their members. That is not the same, and that is not analogous to being a for-profit corporation who has a uniform, I would say a universal, duty to maximize profitability on behalf of their shareholders who, whether they hold one share or thousands of shares, all share in that goal universally, which is why the company is for-profit versus the National Association as a not-for-profit organization. Now, there was a few cases that the, excuse me, that the appellant relies on, and there was a question asked about derivative. Why wasn't this pursued derivatively? I just note for the court, and we note in our papers, that those cases, and particularly the Fox v. Pro Records Operators of Florida case, in fact were A, for-profit corporations, but B, also cases that were brought derivatively on behalf of the organization itself. Putting aside whether there's facts that would give rise here to a breach of the obligation that Mr. Goldklang owed to the not-for-profit organization, the fact of the matter is that this case was not brought as a derivative case, and I submit to you that it was not brought as a derivative case because, frankly, what the appellant is seeking to do here is to seek, get damages for their direct pecuniary loss, which is, frankly, something that it would never have been able to attain derivatively in a derivative case. Well, this case was dismissed at 12B6, right? This was. Twice. Twice. Should it have been allowed to proceed to discovery to determine whether or not there was a violation of his fiduciary derivative to the organization? To the organization itself? To the league. Well, no, because there wasn't a claim. There was no claim asserting that there was a violation to the organization itself for the purpose, again, that that's not what they're seeking to achieve here. They're seeking to achieve here. The claim was strictly to the volcanoes. Strictly to the volcanoes. SEI is the corporate organization that owns the Salem-Kaiser Volcanoes. There have been a litany of other cases that are referenced in the record, frankly, that the Salem-Kaiser Volcanoes have brought against Major League Baseball, against the National Association, against other members of the negotiating committee, against their very own league. But no, that is not what they're seeking to achieve, and frankly, I submit that that's why Judge Semper saw fit to dismiss the same claims, virtually identical claims, in the first amended complaint, and then also, again, in the second amended complaint. Now, to the extent that they are clearly prohibited by Florida not-for-profit law, they do pivot and they assert, that is the appellant asserts, that there was some special, unique, or extraordinary circumstance that would have given rise to an implied fiduciary duty. Now, I would submit to your honors that that's essentially just a way to circumvent and abrogate, get around, that is, the prohibition under Florida not-for-profit law. But what they hang their hat on is this negotiating committee. So I just want to be clear, make sure the panel's clear, more importantly, on what the negotiating committee was. Under the National Exclusive Control over Negotiations with Major League Baseball, I believe Council just referenced that. So after Major League Baseball indicated that they were going to contract, they were going to eliminate the affiliations of 40 teams, the president, and this is set forth in a board resolution and board minutes of the board of trustees, the president decided that he was going to establish a, quote-unquote, negotiating committee. He did so under his authority in the National Association Agreement to create what's called an advisory committee. And in fact, when you look at the board minutes from that meeting when it was created, it specifically says two things that are relevant to this analysis. One, that committee was merely to assist him, essentially to advise him with respect to the negotiations, because at that point the president had realized that Major League Baseball was going to, in fact, eliminate 40 teams. So he wanted people with, as he maintained expressly in that document, that he maintained the independent decision-making over any deal with Major League Baseball. Now, as it ultimately turned out, there was no deal. There was never a consummation of any agreement between Minor League Baseball and Major League Baseball. Ultimately, Major League Baseball let the, I think, I believe it was already been referenced, but let the agreement expire. And then they went directly to the teams that they identified for affiliation and the Major League teams contracted with them directly. So let me break that down a little bit on why it's relevant here. One, Mr. Goldthang's role on the negotiating committee, A, didn't grant him any power whatsoever on what Minor League Baseball, and certainly not what Major League Baseball, decided to do with respect to future affiliation. And I think that's notable and that's certainly established by the facts that are pled in the record. But more importantly, perhaps, there was no direct confidence that was reposed by SEI in Mr. Goldthang or in the negotiating committee whatsoever. In fact, if you look at the complaint, particularly the second-mended complaint, there's no relationship to him whatsoever other than the fact that Mr. Goldthang served on the board of trustees and also at a later point in time on the negotiating committee. Those facts to establish a special relationship, as frankly the cases that are cited by the appellant make clear, need to be a direct and expressed conveyance of trust by one party and an acceptance or an undertaking of that trust by the other party. Clearly, that did not happen here. Otherwise, I submit we would have seen it in one of the multiple complaints that have been filed at this point. It seems part of it. If you have Major League Baseball, and I've followed baseball since I was a kid, back in the 50s, had many minor leagues. It's gotten smaller and smaller and smaller, the number of teams in the minor leagues. The Sally League, Class D League, you don't have any of those anymore. You're down to 120 now, I guess, or maybe even less. And if you own, if Major League Baseball wants to do that and you own a minority interest in a Major League Baseball team, in effect, isn't that ipso facto a conflict? Should he have been on the negotiating committee at all? I don't believe it's a conflict, Your Honor, under the facts as they've been pled here. First of all, Mr. Goldklang's interest as pled is a minute, minor, minority interest. If he advocated, no, we should stay at 160, I could see the Steinbrenner boys not being real happy. Right. Well, first, let's just note, as a matter of the record, long before there was a negotiating committee, Major League Baseball had already indicated they wanted to contract 40 of the teams. And the reason they did this, and it goes to your point about the changing or the evolution of the amount of teams, Major League Baseball had made the decision that they wanted to sort of level the equities. And so each major league team was going to get one minor league team at each level. And that was the way they sort of level set and fair universally throughout the major leagues, because historically, some teams had multiple minor league teams. But to your point, first of all, the negotiating committee didn't have that control. But more importantly, they weren't bestowed with any authority to do anything other than advise and assist the president who maintained his exclusive and control authority at all times over those negotiations. Now, again, it's not disputed by the record, but everyone knew full well Mr. Goldklang, as well as many other owners in minor league baseball, had a minority share interest in the New York Yankees. But lastly, I'll note the Salem-Kaiser Volcanoes are based out of Portland, Oregon. Obviously, Mr. Goldklang's teams, the New York Yankees, they are in different leagues affiliated with different major league baseball teams, and the two never met. There was no intersection whatsoever behind any decision that was made, let alone made by Mr. Goldklang, the negotiating committee, the National Association, the president, or for that matter, major league, that directly correlated between SEI and Mr. Goldklang. And that's why here, while they plead a lot of facts, frankly, that we dispute, but for purposes of this argument don't matter, the reality is those facts really go to a alleged breach of a fiduciary duty. But in order to breach a fiduciary duty, there has to be one in the first place. Thank you. Thank you, counsel. Thank you. I want to start by pivoting off of what was just discussed by counsel regarding the authority of the negotiating committee, and this is quoting from respondent's own brief. It is a well-established principle that a fiduciary duty will be imputed only when trust is implicit in the relationship and the fiduciary undertakes some affirmative act to advise or assist the claimant. So authority to conduct a business deal on behalf of another party is not the metric by which we establish whether a fiduciary duty arose. Again, it's whether in first, it is extremely fact-specific and unique to every situation. And when you have a situation as this one, where an individual with a clear conflict undertakes and assumes a role as your honor identified, communicates that it is taking on this role for the benefit of others, for the economic benefit of others, a duty can be imputed, and that should at least be for the fact finder to determine. When we talk about economic benefit and whether there's that stated in the National Association bylaws, we have to look at not only the bylaws, but look at how the organization actually was run. The control over the economics of all of these teams by the National Association was immense. All the values derived from the exclusivity nature, the guaranteed affiliation as we have alleged in our complaint, that's what derived the economic value of all these teams. The only entity, these teams gave away the ability to negotiate with MLB by being a member. Only the National Association could negotiate with MLB the terms under which they would play baseball, their stadiums would be built, what facility upgraded they had to do, how much they would pay to be a member. All of that was negotiated not by them, but by the entity of which Mr. Goldclaim was a trustee, was on the board of trustees of the entity that controlled all of that for all of the minor leagues clubs. The benefit of being a member was that you had to then give up that control, that economic interest and control. Was the National Association sued? They were sued, yes. Shouldn't that be enough? I don't believe the election of potential claimants would weigh on whether or not a fiduciary duty and whether the claim has merit to move forward from the motion to dismiss phase. There are other reasons that that isn't enough, I'm not sure. In effect, the National Association should have been representing us, they didn't do it. They would argue that the contract had expired and you'd be in that particular thicket. But nonetheless, why sue a member of the negotiating committee because, I guess, that person has a minority interest in the Yankees? Well, there's a reason, and this is what we allege, the unique conduct, and I see my time's out if I may finish, the unique conduct by Mr. Goldclaim that was, we allege certain things the negotiating committee did as a whole, but we allege things that Mr. Goldclaim did outside of the committee that he did himself, and that he also benefited from, again, this independent club that brought in, went from something that would be considered nominally worthless to suddenly being a AAA team worth 50 plus million dollars. Because if you're a guaranteed AAA affiliate, you have value as opposed to an independent baseball. Now, maybe the Savannah Bananas have figured it out, but no other independent team really has ever figured out how to be economically viable. So by getting that affiliation, he brought that conflict, plus his conflict with MLB, plus his independent conduct outside of the committee, those factors bring about the claim of the breach that is unique to Mr. Goldclaim as opposed to others, and as opposed to the Thank you. Thank you, your honor. Thank you, counsel, for your briefs and your arguments.